**CORAL WORLD (V.I.), INC., Plaintiff**
**v.**
**HAROLD ROSS, KORNREICH NIA, ST. PAUL SURPLUS
LINES INSURANCE CO., INC., Defendants**

**HAROLD ROSS and KORNREICH NIA ORGANIZATION, Third-
Party Plaintiff**
**v.**
**TRI-CITY BROKERAGE, INC., Third-Party Defendant**

Civ. No. 1995/183

District Court of the Virgin Islands

Div. of St. Thomas and St. John

July 12, 1999

SAMUEL HALL, St. Thomas, U.S.V.I., *for Coral World (V.I.), plaintiff*

ERIC MOORE, St. Croix, U.S.V.I., *for St. Paul Surplus Lines, defendant*

MOORE, *Chief Judge.*

### MEMORANDUM

Pending before the Court are cross-motions for summary judgment and a motion to amend the complaint. The motion for summary judgment of Defendant St. Paul Surplus Lines Insurance Company, Inc. ["St. Paul"] will be granted. The motion for

summary judgment of plaintiff Coral World (V.I.), Inc. ["Coral World"] will be denied. The motion to amend the complaint to add a bad faith count against St. Paul will be denied as moot, since St. Paul will be dismissed from this action.

## FACTS

Coral World is a marine park on St. Thomas. In the early summer of 1995, in anticipation of the expiration of its then-current property insurance on July 7, 1995, Coral World's manager began discussions with Harold Ross ["Ross"] and the retail insurance broker he worked for, Kornreich NIA ["Kornreich"], to renew Coral World's insurance. Ross contacted Tri-City Brokerage, Inc. ["Tri-City"], a wholesale broker, and Tri-City, in turn, contacted Fenchurch Insurance Brokers, Ltd., a broker for Lloyd's of London ["Lloyd's"] and St. Paul. Lloyd's and St. Paul agreed to split the primary coverage and insure the property for $4 million. The total premium would be $217,917, roughly twice the premium charged the year before by an insurer who was no longer writing policies. On July 7, 1995, St. Paul faxed a binder to Tri-City, binding the coverage for $103,770, its share of the total premium. Tri-City, in turn, faxed to Kornreich its binder stating that Lloyd's and St. Paul were each insuring $ 2 million of the $4 million primary coverage. The binder was not forwarded to Coral World, but on July 14, 1995, Kornreich invoiced Coral World for the full premium of $217,917, as if St. Paul were providing all the coverage, i.e., there was no mention that Lloyd's was sharing the risk.

Coral World, unhappy with the amount of the premium, contacted its insurance expert, Ron Livingstone. Livingstone suggested modifying the coverage by including a provision to limit the loss the insurer would have to pay to $1.5 million. Tri-City ultimately placed the loss limit policy with Lloyd's, having reduced the total insured value of the property and made other changes, for a $120,750 premium. Tri-City issued a binder for the Lloyd's policy on August 18, 1995,[1] and transmitted it to Kornreich

---

[1] Kornreich's bill for the $120,750 premium did not indicate who the insurer would be. Coral World made a down-payment on this premium on August 25th and financed the remainder through an insurance premium finance company. Interestingly, the finance

on September 8th. Kornreich forwarded the binder to Coral World on September 11th, which, unfortunately, was after Hurricane Luis had already struck St. Thomas and Coral World.

In the meantime, however, on August 17th, Tri-City informed St. Paul that it had placed the Coral World risk with Lloyd's and requested a flat cancellation of St. Paul's binder, that is, cancellation with no premium payment. The next day, St. Paul, rejecting the idea of receiving no payment for the roughly six weeks the binder was in effect, canceled the policy, demanded a short-rate payment of $20,837, and requested a lost policy release. Representatives of St. Paul and Tri-City spoke on August 22nd, wherein Tri-City offered to let St. Paul share in the loss-limit policy, but St. Paul refused. No lost policy release was ever obtained by Tri-City from Coral World. St. Paul nevertheless canceled the binder retroactively by issuing a short-term policy for the period July 7th to August 17th, on September 5th, the very day that Hurricane Luis struck the United States Virgin Islands and damaged Coral World. Not two weeks later, on September 15th, Hurricane Marilyn caused further damage.

On September 22nd, Coral World advised Kornreich that Hurricane Luis had inflicted $500,000 to $700,000 in damages, and Hurricane Marilyn had added another $2.5 to 3 million in damages. On November 2nd, Coral World submitted a claim to Lloyd's, which it settled, receiving $173,120 for Hurricane Luis damage and $1,258,000 for Hurricane Marilyn damage.

## DISCUSSION

### Standards for Summary Judgment

Summary judgment, of course, applies to causes of action seeking damages at law and is appropriate thereon "if the pleadings ... together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

---

company's agreement indicated that the insurer was St. Paul. Although these funds were sent to Tri-City, St. Paul never received any premium payment, because the policy was actually with Lloyd's. (*See* ex.s 25, 43.)

383

Summary judgment may be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Once the moving party properly supports its motion for summary judgment, the non-moving party must establish a genuine issue of material fact in order to preclude a grant of summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48. In addition "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

### Application of Standards to this Case

Coral World presents several arguments in support of its position that the policy was in effect at the time of Hurricanes Luis and Marilyn. It asserts that Tri-City was St. Paul's agent and therefore could not seek cancellation on behalf of Coral World, that St. Paul failed to follow the terms of the agreement in canceling the policy, and that there was never a "meeting of the minds" on the cancellation.

Coral World relies on section 46:3 of Couch on Insurance for the proposition that once Kornreich had placed the insurance with St. Paul and Lloyd's, the broker lost the authority to cancel the insurance. Section 46:3 provides, however, that "the authority of an agent or broker specially employed to procure insurance terminates with the procurement **and delivery** of the policy and, in the absence of additional authorization, real or apparent, he or she has no authority to cancel the policy at a later date." Couch on Insurance (Third) § 46:3. Since it is uncontested that the one-year policy was never delivered to Kornreich or Coral World, the Court finds that Kornreich properly exercised its continuing authority to cancel the policy. Kornreich's action canceling the St. Paul coverage is entirely consistent with its placement of the risk on different terms with Lloyd's at a substantially reduced premium.

■ Even without relying merely on the lack of delivery of the St. Paul policy, the deposition of the Coral World manager confirms that Coral World ordered its agent, Kornreich, to find alternate insurance and thus implicitly authorized cancellation of the St. Paul coverage. (*See* Dep. of Uri Pri Gal, Manager of Coral World, at 21-22, "Q: Now, you gave instructions to Ross [broker at Kornreich] to get you coverage different that what was originally provided . . . A: yes." *Id.* at 138. *See also* Dep. of Ross, "Q: So all the reductions and changes that were made in the coverage of Coral World was done at the express instruction of Mr. Pri Gal? A: Correct. . . . Q: But the activity that was going on with Tri-City was based on instructions you had given them? A: Instructions I got from Mr. Pri-Gal." *Id.* at 183-84.) Accordingly, the Court finds that Kornreich acted with real authority from Coral World to cancel the St. Paul policy. Thus, since Kornreich was authorized to seek the cancellation, it is immaterial whether Tri-City was St. Paul's agent, or whether St. Paul acted in conformity with its policy since it was St. Paul who canceled the policy.

The only other question to be decided relates to Coral World's assertion that there was no "meeting of the minds" regarding the cancellation. In essence, Kornreich, as Coral World's agent, requested flat cancellation, seeking to avoid any payment for the coverage which St. Paul provided from July 7 to August 17, the date Kornreich requested cancellation. St. Paul, unsurprisingly, refused to forego its short-rate premium for that time period, insisting on $20,000. Kornreich balked at this sum. The question before the Court thus becomes whether these were offers and counteroffers, with no agreement ever being reached.

The St. Paul binder dated July 7 clearly states "Premium: 103,770 our share subject to 25% ME[P]" (Minimum Earned Premium) (Ex. 39.) The Binder provides: "Minimum Earned Premium. If the first named insured cancels after this policy goes into effect, our charge for early cancellation mentioned earlier in this rule will not be less than 25% of the premium you pay for this policy.' (Ex. 69 at Bates No 00163.)

Despite these clear provisions, when Tri-City on August 17, 1995, contacted St. Paul to inform them that, based on Kornreich's request, Lloyd's had agreed to the loss limit policy and had

back-dated their policy to July 7, Tri-City stated "we are asking for a flat cancellation eff. 7/7." (Ex. 86 at 3.) St. Paul's response was unambiguous:

> Our binder does clearly state that there is an 25% MEP which we are due and we should collect. It appears that you are in a bind, however, and I will concede to short rate cancellation for the 6 week period. **As of 8/17/95 I consider St. Paul no longer on this risk and our binding fax of 7/7/95 is cancelled** [sic]. Considering your request I suggest the insured send us a signed policy release quickly. The premium earned for the period 7/7/95-8/17/95 is $20,837 which will be booked to Tri City Chicago.

(Ex. 87.)

St. Paul's Rule 30(b)(6) witness, who was also a fact witness, testified on deposition that despite the 25% MEP provision, the $20,837 was "different" from the MEP, a cancellation surcharge. (Flick Depo. at 51, 54.) The July 7 to August 17 policy provides that if the insured cancels, St. Paul will "refund the unused premium to the first named insured, less a charge for early cancellation." (Ex. 69 at Bates No. 00159.) Therefore, St. Paul could have charged Coral World the 25% MEP plus a surcharge for cancellation, but did not. St. Paul "gave them a better deal." (Flick Depo. at 52, 54-55.)

■ The Court finds that St. Paul had the contractual right to a 25% MEP, if not also a cancellation surcharge, and was within it rights to demand $20,837. St. Paul's statement that "as of 8/17/95 I consider St. Paul no longer on this risk and our binding fax of 7/7/95 is cancelled" (Ex. 87.) clearly indicates that it was accepting Tri-City's notice of cancellation. If Tri-City intended for the cancellation to be contingent on not paying any premium, it did not communicate that requirement to St. Paul, either before or after St. Paul's response in Ex. 87.

In sum, Coral World's agent, acting with real authority, canceled the St. Paul policy.

## CONCLUSION

The motion for summary judgment of St. Paul will be granted. The motion for summary judgment of Coral World will be denied. The motion to amend the complaint to add a bad faith count against St. Paul will be denied as moot, since St. Paul will be dismissed from this action.

## ORDER

For the reasons stated in the foregoing Memorandum, it is hereby

ORDERED that the motion for summary judgment of St. Paul is GRANTED. It is further

ORDERED that the motion for summary judgment of Coral World is DENIED. It is further

ORDERED that the motion to amend the complaint will be DENIED AS MOOT.

ENTERED this 12th day of July, 1999.